## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **ROBERT J. KOLENCIK, Individually** | : | |
| **and as ADMINISTRATOR of the** | : | |
| **ESTATE OF MELISSA KOLENCIK,** | : | |
| | : | **CASE NO. 1:04-CV-3705-JOF** |
| **Plaintiff,** | : | |
| | : | |
| **vs.** | : | |
| | : | |
| **PROGRESSIVE PREFERRED** | : | |
| **INSURANCE COMPANY, and** | : | |
| **GULF INSURANCE COMPANY,** | : | |
| | : | |
| **Defendants.** | : | |

## BRIEF IN SUPPORT OF PLAINTIFF'S
## MOTION FOR SUMMARY JUDGMENT

COMES NOW the Plaintiff, by and through counsel, and hereby files this Brief

in support in of his Motion for Summary Judgment against defendant Progressive

Preferred Insurance Company.  As grounds for this Motion, the Plaintiff shows the

Court the following:

### STATEMENT OF FACTS

On August 27, 2003, Melissa Kolencik was killed when the vehicle she was

driving was struck by an unsafe dump truck being recklessly operated by Kenneth

1

Burnham.[1]   The dump truck belonged to defendant Jerry Yarbrough d/b/a J&J

Trucking and Excavating a fly by night, unregistered dump truck operator doing

business in the states of Tennessee and Georgia.[2]   In or about March 2003, Mr.

Yarbrough d/b/a J&J Trucking and Excavating entered into a business arrangement

with T. I. Wood Enterprises, Inc. wherein T. I. Wood Enterprises, Inc. agreed to rent

trucks from  Mr. Yarbrough from time to time as needed.   *(Tammy Wood depo.,*

*Exhibits 6-7; 10)*.   Under this Truck Rental Agreement dump trucks were rented to

T. I. Wood for a job that began on the day of the accident near Cartersville, Georgia.

As reflected by exhibits attached to the deposition of Tammy Wood (the President

and Owner of T. I. Wood Enterprises, Inc.) and the Affidavits of Billy Boyd and

Bobby Thurmond, this particular hauling job lasted for several days, from 8/27/03

through 9/5/03.  (*See Exhibits T & U; Thurmond and Boyd Affidavits; Wood depo pp.*

---

[1]Ms. Kolencik was 40 years old at the time of her death.  She was employed outside the home earning $36,000/year and was survived by her husband of 20 years and two teenage sons.  She lived several days after the accident prior to succumbing to multiple serious injuries.

[2]According to Betty Blount of the Georgia Department of Motor Vehicle Safety, Mr. Yarbrough was not registered to conduct commercial operations in Georgia as he should have been (and therefore had no filings of record for the protection of the public) and the only way he could legally operate in this instance, being unregistered, was to operate under the authority of the company which hired his services, T. I. Wood.  *See* Exhibit W, Blount Affidavit.

2

*98-99; Exhibits 9, 13 and 14).*   Mr. Yarbrough and his drivers were unable to complete this job because their trucks were impounded following the accident. Additionally, both Mr. Yarbrough and a driver, Darlene Cleckner, were arrested following the subject incident.[3] Consequently, even though the particular hauling job at issue lasted several days after the date of accident, Mr. Yarbrough, his drivers and trucks were unavailable to T. I. Wood after the date of the collision.  *(Exhibit M, Ellege Trial Transcript.)*[4]

There were two dumptrucks owned by Mr. Yarbrough involved in this fatal collision, both of which were under dispatch to T. I. Woods at the time of the subject incident.  (*Wood depo., p. 89*).  One was being operated by Darlene Sue Cleckner (also an employee of Jerry Yarbrough d/b/a J&J Trucking and Excavating) and the second was being operated by Mr. Burnham.  Due to the reckless driving of Ms. Cleckner, she set into motion the events which ultimately resulted in the collision

---

[3]Ms. Cleckner was arrested for vehicular homicide and Mr. Yarbrough for obstruction.  In the Order of Judgment below, among other aggravating facts, the Trial Court specifically found that Yarbrough had obstructed justice, concealed evidence and mislead the investigating authorities.  *See Exhibit C.*  Yarbrough plead guilty to these charges and was sentenced to prison.  *See Exhibit Y.*

[4]The Plaintiff attached to his Complaint Exhibits A-L.  Exhibits M-Z are attached to Plaintiff's Notice of Filing, filed contemporaneously with this Motion.

between Mrs. Kolencik's Landrover and the dump truck being operated by Mr. Burnham. According to eyewitnesses who have provided deposition testimony, the two dump trucks responsible for the subject collision were both engaged in reckless driving and were speeding. (*Exhibit N, Ford depo. pp. 11-12 & 66; Exhibit O, Lacey depo., pp. 7-9; 11-13 & 16-17*).[5]  Ms. Darlene Sue Cleckner  who was operating a 1981 Ford dump truck, was speeding and was following too closely a vehicle being operated by defendant Nishica, who was then and there operating a 2002 Honda Civic. Mr. Nishica crossed the centerline to avoid being struck in the rear by the Cleckner dump truck. As a result of Mr. Nishica's maneuver, he pulled directly into the path of Mrs. Kolencik which in turn caused her to lose control briefly, run off the pavement and ultimately collide with the Burnham truck which was itself speeding and following the Cleckner truck too closely. (*See Exhibit O, Lacey depo., pp. 7-9; 11-13 & 16-17; Exhibit N, Ford depo., pp. 11-12, 25, 66-67)*.[6]  The Burnham truck

_____

[5]Per the Second Stipulation filed in this case, to avoid redundant deposition testimony, the parties agreed that depositions of Olin Ford, Gary Lacey, Darlene Sue Cleckner, Kenneth Burnham and Gary Thacker taken in the Cobb County Superior Court action can be used in this case subject to the admissibility requirements of Federal Rules of Evidence. See Second Stipulation.

[6]The plaintiff has attached to his Notice of Filing the Certified Guilty Plea of Mr. Burnham and Ms. Cleckner to the state criminal charges filed against them arising out of the subject incident. *See Exhibits X and Z*.  Ms. Cleckner plead

was inspected after this collision and six of its brakes were also found to be out of

adjustment.   The evidence also establishes that both trucks were known to be unsafe

and had been cited for numerous mechanical and safety problems less than two weeks

before the accident.  (*Exhibit M; Officer Ellege Transcript)*.[7]

At the time of the subject incident, the unregistered two dump trucks owned by

Jerry Yarbrough d/b/a J&J Trucking and Excavating, had been rented by T. I. Wood

Enterprises, Inc. to assist on a job T. I. Wood Enterprises, Inc. was doing for one of

its clients by the name of HBW Development Company.  (*Exhibit U; Boyd Affidavit*).

Documents were introduced during the deposition testimony of Tammy Wood (the

President of T. I. Wood) clearly establishing that the Yarbrough dump trucks had

been rented for the express purpose of assisting T. I. Wood Enterprises, Inc. in its

own business responsibilities to its client HBW Development Company.   (*Tammy*

*Wood depo pp. 22-36; 52-58; Exhibits 6, 10 and 10a*).  The Rental Agreement was

still in effect at the time of the subject collision.  (*Exhibits T and U*).   Throughout

2003, under the referenced Truck Rental Agreement, Mr. Yarbrough had rented his

---

guilty to following too closely, hit and run and vehicular homicide.

[7]Mr. Yarbrough plead guilty to permitting his drivers to drive his trucks notwithstanding his full knowledge of the numerous violations of federal law relative to the safety of the operation of the trucks.  *See Exhibit Y.*

trucks to T. I. Woods on eight (8) different occasions. (*Wood depo., Exhibits 6-8; 10*). The payment to Jerry Yarbrough for the work which was done for HBW was specifically classified by T. I. Woods as a "truck rental" expense. *(Wood depo, Exhibits 10 and 10a)*.

Following the wrongful death of his deceased wife, utilizing one of the options available to him under *O.C.G.A. § 46-17-12*, the Plaintiff instituted litigation in the Superior Court of Cobb County in the case of *Robert J. Kolencik, Individually and as Administrator of the Estate of Melissa Kolencik v. T. I. Wood Enterprises, Inc., Jerry Yarbrough d/b/a J&J Trucking and Excavating and/or J&J Trucking and Excavation, Darlene Sue Cleckner, Kenneth Burnham and Akil Nishica*, Civil Action File No. 04-1-00549-40. *See Exhibit B*.[8]   After the Plaintiff filed the lawsuit described above, written notice (including the Superior Court Complaint) was sent notifying the defendant of Plaintiff's contentions that the two dump truck drivers

---

[8]Under O.C.G.A. § 46-7-12, at the Plaintiff's option, he could properly sue together or alone, the carrier, its driver/agents and/or the insurance carrier(s) for the trucking companies. *See Tarrant v. Davis*, 62 Ga. App. 880, 10 S.E. 2d 636 (1940).  Under Georgia law, a judgment against driver/agents is binding against the insurance carrier. *See Spicer v. American Home Assurance Company,* 292 F. Supp. 27 (N.D. Ga.), aff'd 402 F. 2d 988 (5th Cir. 1969).  Here, Plaintiff elected to name the driver/agents as defendants in the action below which is legally binding against the insurance carrier under Georgia's unique direct action statute.  See pp. 44-46, infra.

were acting as the dual agents of Yarbrough and T. I. Woods Enterprises, Inc.  <u>See</u> Exhibit K.  Nonetheless, the defendant took  no action to protect its interests in the Cobb County lawsuit nor did it seek a Declaratory Judgment concerning its rights and/or responsibilities with respect to same.

On November 18, 2004, the Plaintiffs obtained joint and several Judgments against  Jerry Yarbrough d/b/a J&J Trucking and Excavating and/or J&J Trucking and Excavation and against Darlene Sue Cleckner and Kenneth Burnham individually.  *(A true and correct copy of the Judgment obtained in Superior Court of Cobb County is attached to the Complaint as Exhibit C).*  Prior to the entry of the Judgment, Progressive intentionally elected not to intervene in the Cobb County action nor did it seek a declaration of their its and responsibilities regarding the case. It is therefore bound by the Judgment as to liability and damages.

In this action, the Plaintiff seeks to collect six separate judgments.  Per Exhibit C, he obtained the following judgments:  In his capacity as surviving spouse, for the wrongful death of his wife, he obtained 3 judgments of $4 million each, jointly and severally, against Jerry Yarbrough, Darlene Sue Cleckner and Kenneth Burnham.  As Administrator of his deceased wife's estate, he obtained two judgments (joint and several) against Darlene Sue Cleckner and Kenneth Burnham in the amount of

7

$1,083,210.26 and a separate judgment against Jerry Yarbrough for $7,416,543.60. The total of the judgments obtained against Cleckner and Burnham was $5,083,210.26.   The total judgments against Yarbrough was $11,416,543.60. Plaintiff contends that he is entitled to collect these six judgments from two policies issued by the defendant.

At the time of the fatal collision, T. I. Wood Enterprises, Inc. was insured by the Progressive Preferred Insurance Company.   Progressive had issued a policy bearing policy number CA4196911-3 to T. I. Wood Enterprises, Inc. with a policy period of 11/27/02 through 11/27/03.  It is undisputed that this $1,000,000 liability policy was in full force and effect on the date of the incident.  A copy of the policy and applicable Declarations Pages are attached to Plaintiff's Complaint.  *(See Exhibit A)*.[9]  Additionally, pursuant to state and federal filing requirements, the Progressive Preferred Insurance Company had filed a form BMC-91X with the Federal Motor Carrier Safety Administration, U. S. Department of Transportation and had also filed a form E with the Georgia Department of Motor Vehicle Safety.  Both forms were of record at the time of the subject incident and both forms pertained to policy number

[9]Exhibits A - K are attached to Plaintiff's Complaint.  Progressive has admitted in Response to Request for Admissions that all of these documents are authentic.

CA4196911-3.  *(See Exhibits D, E - I)* Progressive has admitted that there was also in effect at the time of the subject incident an MCS-90 endorsement to policy number CA4196911-3.  *(See Stipulation of Facts; Progressive Counterclaim, Fourth Count; ¶ 36.)*  As established by the evidence, Progressive Preferred had previously insured T. I. Wood Enterprises, Inc. on other occasions and had also filed other form E's, some of which had been cancelled.  One of the prior form E's, however, had <u>not</u> been cancelled by filing a form K (Notice of Cancellation) with the State.  See Progressive's Response to Request for Admission No. 20.  This uncancelled Form E pertains to policy number CA4196911-1, an earlier Progressive policy issued in 2001. *(See Exhibits G, H)*  Thus, at the time of the subject incident, it is undisputed that there were two form E's filed by Progressive with the Georgia Department of Motor Vehicle Safety, neither of which had been cancelled by Progressive.  As no form K's had been filed with the State relative to the 2 Form E's cancelling the same, this means there were 2 form E's of record with the State of Georgia at the time of the subject incident relative to the legal responsibilities of T. I. Wood, both of which were filed by Progressive (2003 and 2001).  *(See Exhibit V, Certified Records of Georgia DMVS)*.  It is also undisputed that there was on file with the United States Department of Transportation two BMC-91X forms (and corresponding MCS-90

endorsements to the policies) providing $1 million in liability insurance coverage through the provisions of both Progressive policies (CA4916911-3, CA4916911-1). *(See Exhibit D; Progressive Response to Request for Admissions Nos. 4, 12, 13 and 16; Stipulation of Facts; Progressive's Counterclaim, Fourth Count, ¶ 36).*

## THE ISSUES OF THE CASE

In Count One of the Complaint filed in this action, the Plaintiff seeks to enforce the six judgments he obtained in a state wrongful death action from the defendant under two separate policies. Because he obtained judgments against the driver/agents of T. I. Wood Enterprises, Inc., under O.C.G.A. § 46-7-12 and the legal authority thereunder, the Plaintiff contends that he is entitled to collect his six judgments from the defendant to the full extent of the coverage provided by its policies. Because of an ambiguity in the Progressive  policies, however, the Plaintiff is uncertain about much coverage is available to him, thus, in Count Two Plaintiff seeks a Declaratory Judgment to determine the extent of coverage available for the joint and several judgments he obtained against Jerry Yarbrough, Darlene Sue Cleckner, and Kenneth Burnham.

Because it is anticipated that the defendant may contend that the Plaintiff is required to obtain judgments against T. I. Wood Enterprises, Inc. *per se* as opposed

10

to its driver/agents, in the alternative and out of an abundance of caution, the Plaintiff has filed a direct action against the defendant in Count Three under the provisions of O.C.G.A. § 46-7-12.  The Plaintiff contends that he is not required to proceed under Count Three because he already has judgments against the driver/agents of T. I. Wood Enterprises, Inc. *(See Spicer v. American Home Assurance Company, 292 F. Supp. 27 (N.D. of Ga.) aff'd, 402 F. 2d 988 (5th Cir. 1969); Williams v. Southern Drayage, Inc., 213 Ga. App. 895, 446 S.E. 2d 758 (1994)).*  In the event the Plaintiff is incorrect and he is required under O.C.G.A. § 46-7-12 to obtain a judgment against T. I. Wood Enterprises, Inc. directly as opposed to its agents the Plaintiff alternatively seeks summary judgment on Count Three as to the legal liability of T. I. Wood Enterprises, Inc. for its driver/agents Jerry Yarbrough, Darlene Sue Cleckner and Kenneth Burnham.  As established by the record in this case, there is no genuine issue of material fact as to the vicarious liability of T. I. Wood Enterprises, Inc. for the established negligent acts of Jerry Yarbrough, Darlene Sue Cleckner and Kenneth Burnham.

## ARGUMENT AND CITATION OF AUTHORITY

The motor truck industry is closely regulated.  In order to obtain operating authority, a carrier must demonstrate adequate financial ability, insurance coverage,

and ability to serve the public in compliance with stringent safety requirements, both as to equipment and competence of drivers. When a carrier utilizes non-owned trucks in its business operations, and permits an unregulated truck and driver to be on the road, it makes it possible for the owner of that unregulated equipment and the driver thereof to do what otherwise he could not do. As shown below, state and federal regulations make the carrier responsible for the owner/operator's conduct which includes financial ability, insurance coverage, safety of equipment and competence of drivers. Absent such a policy, when innocent people are hurt or killed, there will be, as here, a round-robin of finger pointing by carriers, lessors owners, drivers and insurers, raising issues of independent contractor, frolic and detour, what instructions the driver had, agency and the like, in the attempt to evade responsibility for the carnage wrecked upon innocent motorists. A Plaintiff encounters much difficulty in fixing responsibility, for only the carrier and the owner/operator really know their arrangements. In these circumstances, a Plaintiff should not be required to bear this burden, nor should he be required to settle for a financially irresponsible defendant fathered by the carrier. In short, the policy enunciated in both state and federal regulations and the cases thereunder make the carrier totally responsible to the injured Plaintiff as a matter of law for the negligence of the owner/operator and its drivers.

The lessee carrier must, at its peril, exert care in its business arrangements and avoid agreements with "fly-by-night" truckers like Jerry Yarbrough.  The regulations and cases demand that the carrier police such arrangements just as it is policed by the federal and state authorities.

A.    **The Federal Regulatory Scheme for Commercial Motor Carriers**

During the first half of the twentieth century, motor carriers attempted to immunize themselves from liability for negligent drivers by leasing trucks and nominally classifying the drivers who operated the trucks as "independent contractors."  *See  White v. Excalibur Ins. Co.*, *599 F. 2d 50, 52 (5th Cir. 1979), cert. denied, 444 U.S. 965, 100 S. Ct. 452,62 L.Ed.2d 377 (1979); see also Am. Trucking Ass'ns v. United States, 344 U.S. 298, 304-04, 73 S.Ct. 307,311-12, 97 L.Ed. 337 (1953)* (detailing pre-amendment problems and abuses that threatened public interest and vitality of trucking industry); *Empire Fire & Marine ins. Co. v. Guaranty Nat'l Ins. Co.*, *868 F.2d 357, 362 (10th Cir. 1989) (same)*.  In order to protect the public from the tortious conduct of the often judgement-proof truck-lessor operators, Congress in 1956 amended the Interstate Common Carrier Act to require motor carriers to assume full direction and control of the vehicles that they leased "as if they were the owners of such vehicles." *Price v. Westmoreland*, *727 F.2d 494,495-96 (5th*

*Cir. 1984); Simmons v. King, 478 F.2d 857, 866-67 (5th Cir. 1973); Wirtz v. Dependable Trucking Co., 260 F.Supp. 240, 243 (D.N.J. 1966).* The purpose of the amendments to the Act was to ensure that motor carriers would be fully responsible for the maintenance and operation of the leased equipment and the supervision of the borrowed drivers, thereby protecting the public from accidents, preventing public confusion about who was financially responsible if accidents occurred, and providing financially responsible defendants. See *Integral Ins. Co. v. Lawrence Fulbright Trucking, Inc.*, 930 F.2d 258, 261(2nd Cir. 1991); *Empire Fire & Marine Ins. Co.*, 868 F. 2d at 362; Alford v. Major, 314 F.Supp. 979, 983 (N.D.Ind.1970), aff'd, 470 F.2d 132 (1972); Wirtz, 260 F.Supp at 243; Graham v. Malone Freight Lines, Inc., 948 F.Supp. 1124, 1132 (D.1996), clarified on reconsid., 43 F.Supp.2d 77, aff'd, 201 F.3d 427, 1999 WL 1338356; see also Transam Freight Lines, Inc. v. Brada Miller Freight Sys. Inc., 423 U.S. 28, 36, 96 S. Ct. 229, 233, 46 L.Ed.2d 169 (1975)* As a result of the regulatory authority granted in the Act, the Interstate Commerce Commission (ICC) issued regulations that require a carrier who leases equipment to enter into a lease agreement with the equipment owner providing that the carrier-lessee shall have exclusive possession, control, and use of the equipment, and shall assume complete responsibility for the operation of the equipment, for the duration

14

of the lease. *49 C.F.R. § 376-11-.12 (2000); Price, 727 F.2d at 496 & n. 2 (applying predecessor to part 376).* These regulations are known as the Federal Motor Carrier Safety Regulations. *49 C.F.R. subch. B (2000).* The lessee must also insure any leased vehicles. *49 U.S.C. § 11107(a)(3); 14102.*

Because under the FMCSR motor carriers have both a legal right and duty to control leased vehicles operated for their benefit, the regulations create a statutory employee relationship between the employees of the owner-lessors and the lessee-carriers. *White*, 599 F.2d at 52-53; see also *Meyers v. Norton Ramsey Motor Lines, Inc., No. 4:96CV324-D-B, 1997 WL 170308, at (N.D.Miss.1997)* (recognizing that ICC regulations create statutory employee relationship between ICC carrier and drivers and equipment covered by lease agreement). Thus, a motor carrier's liability for equipment and drivers covered by leasing arrangements is not governed by the traditional common-law doctrines of the master-servant relationship and respondeat superior. Instead, a carrier is vicariously liable as a matter of law under the FMCSR for the negligence of its statutory employee drivers. *See, e.g. Empire Indem. Ins. Co., v. Carolina Cas. Ins. Co., 838 F.2d 1428, 1433 (5th Cir.1988); Planet Ins. Co., 823 F.2d at 288; Price, 727 F.2d at 496; Grinnell Mut. Reinsurance Co. v. Empire Fire & Marine Ins. Co., 722 F.2d 1400, 1404 (8th Cir. 1983), cert. denied, 466 U.S. 951,*

15

*104 S.Ct. 2155, 80 L.Ed.2d 540 (1984); Rodriguez v. Ager 705 F.2d 1229, 1233-36 (10th Cir.1983); Simmons, 478 F.2d at 867; Mellon Nat'l Bank & Trust Co. V. Sophie Lines, Inc. 289 F.2d 473, 476-77 (3rd Cir.1961).*

Under Section 10927 of the Motor Carrier Act, the ICC can issue an operating permit to a motor carrier only if the motor carrier has filed an adequate "bond, insurance policy, or other type of security . . . in an amount not less than . . . the Secretary of Transportation prescribes." *49 U.S.C.A. § 10927(a)(1) (West Supp.1994).*[10] Morever, ICC regulations require that a motor carrier's surety bond or insurance policy be sufficient "to pay any final judgment recovered against such motor carrier for bodily injuries to or the death of any person resulting from the negligent operation, maintenance or use of motor vehicles subject" to ICC regulation. *49 C.F.R. § 1043.1(a) (1993).* Finally, in order to assure compliance with section *10927(a)(1)* and *49 C.F.R. § 1043.1(a)*, the form ICC endorsement (an MCS-90) <u>must</u> be included in the insurance policies of all ICC registered carriers.[11] *<u>See</u> Canal Ins.*

_____

[10]The <u>minimum</u> amount of liability protection for personal injuries is $750,000.00 <u>See</u> 49 C.F.R. 1043.2(b)(2) (1995); 49 C.F.R. 387 (1997).

[11]In a case such as this, the regulations specify that the required insurance is to be provided by a Form MCS-90 endorsement, <u>See</u> 49 C.F.R. § 1043(a)(4) (1995) and the proof of fulfilling this insurance requirement is to be satisfied by the filing of a Form BMC 91X.  <u>See</u> 49 C.F.R. § 1043(a)(3) (1995); <u>See</u> <u>also</u> 49

*Co. v. First Gen. Ins. Co., 899 F.2d 604, 611 (5ᵗʰ Cir.1989).*   It is undisputed that

Progressive Preferred filed a BMC-91X form on behalf of T. I. Woods which was in

effect on the date of the accident, as was an MCS-90 endorsement to its policy.  *See*

*Exhibit D; Progressive Counterclaim ¶ 36.*  (Progressive had earlier filed such forms

in 2001, along with a Certificate E form.  *See Exhibits G - I.*  Progressive failed to

cancelled the prior Certificate E.)   The federal filings provide for $1,000,000 in

coverage.[12]   The endorsement MCS-90, as mandated by Sections 29 and 30 of the

Motor Carrier Act of 1980 *(49 C.F.R. § 387.7(d)(1)*) requires insurance companies

who insure vehicles owned or leased by interstate trucking companies to include this

additional coverage, up to the required levels, 49 C.F.R. §§ 387.9 and 387.303,

regardless of whether the vehicle is listed as a covered vehicle on the policy. 49

C.F.R. § 387.15, adopted pursuant to *49 U.S.C. § 13906 (a)(1) and (f). ( A "lease"*

*is defined under) U.S.C.A. § 13102 and 49 C.F.R. §376.2(e*) as "a contract or

arrangement in which the owner grants the use of the equipment . . . to an authorized

carrier for use in the regulated transportation of property."  The statutorily required

---

C.F.R. § 387-15 (1997).

[12]The $1 million limits provided is more than the $750,000.00 minimum
required by federal law.  *49 C.F.R. § 1043.2(b)(2).*

MCS-90 endorsement in the prescribed form reads, in relevant part:

> In consideration of the premium stated in the policy to which this endorsement is attached, the insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of Sections 29 and 30 of the Motor Carrier Act of 1980 regardless of whether or not each motor vehicle is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere.  The insured agrees to reimburse the company for any payment made by the company on account of any accident, claim, or suit involving a breach of the terms of the policy, and for any payment that the company would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement.[13]

Under the express terms of the MCS-90 (also referred to as "the ICC endorsement"), its scope supercedes any limitations, exclusions, exceptions, or conditions of the base policy.  The history and policy behind federal regulation of interstate carriers, specifically with respect to their use of leased tractor-trailers, has been set forth in many cases, both federal and state.  *E.g., T.H.E. Ins. Co. v. Larsen Intermodal, 242 F.3d 667, 672 (5th Cir.2001); Progressive Casualty Ins. Co. v.*

---

[13]Progressive has admitted that such a form endorsement was in effect at the time of the subject incident.  Stipulation of Facts; Progressive Counterclaim ¶ 36.  Additionally, per Exhibit I, it is undisputed that Progressive had also issued a form MCS-90 endorsement for its earlier policy.

*Hoover, 570 Pa. 423, 809 A. 2d 353, 359 n. 9, n. 10 (2002).*  The Fifth Circuit in

*T.H.E. Ins. Co.* summarized that history and the underlying public policy:

> The MCS-90 was required under the regulations of the now-defunct Interstate Commerce Commission ("ICC").  When the ICC was abolished, its authority to regulate carriers was transferred to the Department of Transportation, but the old regulations remain in effect until new ones are promulgated.  *John Deere Ins. Co. v. Nueva*, 229 F. 3d 853, 855 n. 3 (9ᵗʰ Cir. 2000).  This Court has stated that ICC endorsements are governed by federal law.  *Canal Ins. Co. v. First Gen. Ins. Co.*, 889 F.2d 604, 610 (5ᵗʰ Cir. 1989), modified on other grounds, *901 F.2d 45 (5ᵗʰ Cir. 1990) (citing Carter v. Vangilder, 803 F.2d 189, 191 (5ᵗʰ Cir. 1986)).  We also held that the policy embodied in the ICC regulations "was to assure that injured members of the public would be able to obtain judgments collectible against negligent authorized carriers."  *Canal v. First Gen.*, 889 F.2d at 611.  Thus, <u>the insurer's obligations under the MCS-90 are triggered when the policy to which it is attached provides no coverage to the insured</u>.  The First Circuit has aptly described the obligation placed upon the insurer by the MCS-90 as one of suretyship.  "[W]e consider the ICC endorsement to be, in effect, suretyship by the insurance carrier to protect the public–a safety net . . . [I]t simply covers the public when other coverage is lacking."  *Canal Ins. Co. v. Carolina Cas. Ins. Co.*, 59 F.3d 281, 283 (1ˢᵗ Cir. 1995).  (Emphasis supplied).

Application of the MCS-90 endorsement does not depend on whether the

carrier was hauling one particular type of product on the day of the accident instead

of another.  Such an application would not advance the public policy goals of the

Motor Carrier Act in protecting the general public, and it also would defy common

sense. (<u>See</u> *Magann Equip., Inc. v. Buffkin*, 238 Va. 712, 385 S.E.2d 619, 622 (1989)).

Whether or not T. I. Woods Enterprises, Inc. was required to have an ICC endorsement for the particular trip at issue here, nothing prevented them from voluntarily purchasing the endorsement for their trucks and trips if they so desired. *Cf.  Fawley Motor Lines, Inc. v. Cavalier Poultry Corp.*, *235 F.2d 416, 418 (4th Cir. 1956)* ("The owner of a motor vehicle may use it for the purpose of transporting agricultural commodities in interstate commerce without obtaining a certificate of convenience and necessity . . . or complying with any provisions of the act; but there is nothing in this exemption which forbids common carriers hauling agricultural commodities . . . to cover such hauling" should they decide to comply with the Interstate Commerce Act.).   Accordingly, once issued, bought, and paid for, T. I. Wood's MCS-90 ICC endorsement providing $1,000,000 in coverage, and the public policy upon which it was based, provided coverage in this case–regardless of the type of product that T.I. Wood's driver/agents were hauling on the day of the accident in question. (*See Royal Indemnity Company v. Jacobsen*, *863 F. Supp. 1537 (D. Utah 1994); Gulf v. Kline, 98 Fed. App x. 471, 475-476 (6th Cir. 2004); Transport Indem. Co. v. Paxton Nat'l Ins. Co., 657 F.2d 657, 659 (5th Cir.1981), cert. denied*, *455 U.S. 982, 102 S.Ct. 1490,  71 L.Ed.2d 692 (1982)*)).

It is noteworthy that the U. S. DOT regulations are even broader than those of

the ICC.  The ICC did not implement its own endorsement, but rather adopted the DOT's MCS-90 endorsement for those motor carriers subject to the ICC regulations. Notice of Final Rules, 132 M.C.C. 948, 1982 WL 600 28482 at 1.  Thus, the MCS-90 endorsement is not limited to those carriers specifically subject to ICC jurisdiction. Rather, the MCS-90 endorsement required by the DOT explicitly applies in many situations (*e.g.,* transportation of hazardous commodities and intrastate for-hire carriers) even where the transportation arguably falls outside the jurisdiction of the ICC. (*See Century Indemnity Co. v. Carlson*, *133 F. 3d 591 (8th Cir. 1998)*).  Where a motor carrier for hire is available for both interstate and intrastate work to a lessee, even if not used in interstate commerce on a particular job, such availability also confers federal jurisdiction. *See QBE Ins. Co. v. P&F Container Svcs.*, *828 A. 2d 935 (2003)*; *Reliance National Insurance Co. v. Royal Indemnity Co., 2001 WL 94737 (S.D.N.Y. Aug. 24, 2001).*[14]

Progressive's filing of its Form BMC 91X in 2003 certified that the motor carrier's liability insurance policy had been amended by the Form MCS 90 endorsement. ( *See Exhibit D).*   Progressive has also admitted that a form MCS-90

---

[14]Jerry Yarbrough d/b/a J&J Trucking operated in <u>interstate</u> commerce as a commercial dump truck operation primarily in the States of Georgia and Tennessee. *See Exhibit C; Wood Exhibits 21-22.*

endorsement was in effect at the time of the subject incident. *(See Progressive's Response to Request for Admissions No. 12; Progressive's Counterclaim, Fourth Count; ¶ 36)*. It is the MCS 90 Endorsement that, by its terms, obligates the user to cover all motor vehicles "regardless of whether or not each motor vehicle is specifically described in the policy ..." 49 C.F.R. § 387.15 (1997) (Form MCS 90). *Canal Ins. Co. v. Distribution Services, Inc., 176 F. Supp. 559 (E.D. Va. 2001)*. Accordingly, to the extent that Progressive is liable in this case by virtue of having filed a Form BMC 91X Certificate with the government, its liability arises from the fact that by making this filing, its policy is deemed to have been amended to include the MCS 90 Endorsement coverage for non-owned vehicles. *Northland Ins. Co., v. New Hampshire Ins. Co., 63 F. Supp. 128, 139 (D.N.H. 1999); Adams v. Royal Indemnity, 99 F. 3d 964, 968 (10th Cir. 1996)*. Again, Progressive has admitted that the MCS-90 endorsement was in effect at the time of the accident. *( See Stipulation; Progressive's Counterclaim; Fourth Count; ¶ 36)*. Further, for purposes of the MCS-90 endorsement, "motor carrier" is defined as a "for hire motor carrier" and includes a motor carrier's "agent." 49 C.F.R. § 387.5.

**B.    The State Regulatory Scheme for Commercial Motor Carriers**

_____A motor common or contact carrier engaged in both interstate and intrastate

commerce is nonetheless subject to state statutory provisions governing motor common and contract carriers when the carrier's operations are performed in Georgia O.C.G.A.§ 46-7-36.  The term "carrier" is defined by statute to mean "a person who undertakes the transporting of goods or passengers *for compensation*" O.C.G.A. § 46-1-1(1) (emphasis added).  The statutory definitions of motor common carrier and motor contract carrier both pertain to the business of transporting persons or property *for hire* over the public highways of *Georgia.  National Union Fire Ins. Co. v. Sorrow*, *202 Ga. App. 517, 518, 414 S.E. 2d 731 (1992)*, citing former O.C.G.A. § 46-1-1(7)(A) and (B), which are presently codified as O.C.G.A. §46-1-1(9)(A) and (B), Ga. Laws 1996, p. 950, effective April 15, 1996.  "For hire" is defined by statute as "an activity wherein for compensation a motor vehicle and driver are furnished to a person by another person . . ." *O.C.G.A.§ 46-1-1(6)*.  This statutory definition is expressly adopted in Rule 3-1.5 of the Transportation Rules of the Georgia Public Service Commission.  When a motor vehicle is used exclusively by an entity to transport its own products and is not held out for hire to the public or hired for the transportation of goods or passengers, such vehicle does not qualify as a motor common carrier or a motor contract carrier.  *National Union Fire Ins. Co. v. Sorrow*, *202 Ga. App. 517, 518, 414 S. E. 2d 731 (1992)*.

By statute, in 1931, the Georgia Legislature authorized the Public Service Commission "to adopt such rules and orders as it may deem necessary in the enforcement of [ the motor common carrier and motor contract carrier articles]" and "[s]uch rules and orders . . . shall have the same dignity and standing as if such rules and orders were specifically provided in [the motor common carrier and motor contract carrier article]."  Pursuant to this enabling legislation, the Georgia Public Service Commission promulgated rules and regulations governing the operation of motor common carriers and motor contract carriers in Georgia.  Effective July 1, 2001, the responsibilities of enforcing and administering these rules and regulations were transferred to the Department of Motor Vehicle Safety.  These rules and regulation are virtually identical to those previously promulgated by the Interstate Commerce Commission.  (*See Exhibit P, Rule 8-3.1 Re: Leasing of Motor Vehicles*). These rules establish that a lessee such as T. I. Wood Enterprises, Inc. assumes complete legal responsibility for leased trucks, must inspect them for safety hazards and must insure them.  Tammy Wood admitted that her company never inspected the dump trucks involved.  (*Wood depo., pp. 41-42*).   Had it done so, it would have discovered numerous defects in both trucks, including bad brakes. (*Exhibit M, Ellege Transcript*).  Like so many other irresponsible carriers have done over the years,

Tammy Woods and T. I. Wood Enterprises, Inc. also seek refuge in the tired and rejected argument that Yarbrough and the drivers were "independent contractors." (*See* Wood depo., Exhibits 25 and 26,  T. I. Wood's Answer in the Superior Court action below).

As such, the independent contractor concept is eliminated from business arrangements between owner/operators and motor carriers regulated by the Department of Motor Vehicle Safety (formerly the Georgia Public Service Commission). *Reliance Ins. Co. v. Bridges, 168 Ga. App. 874, 878(1) 311 S.E. 2d 193 (183)* Thus, when examining vicarious liability issues regarding motor carriers for hire, ICC rules and regulations control in Georgia and under established case authority eliminate the concept of an "independent" owner operator.  In such circumstances a lease agreement must be employed (regardless of the nature of the business arrangement) and the motor carrier lessee becomes fully responsible for the use of the leased trucks. *Nationwide v. Holbrooks*, *supra*.; *Judy v. Tri-State Motors Transit Co.*, *844 F. 2d 1946, 1502, (11th Cir. 1988)* ( interpreting Georgia law).  This is the same as federal law.

A motor common carrier may not operate in Georgia without obtaining from the PSC a certificate of public convenience and necessity ( *OCGA § 46-7-3*), and a

certificate is not issued unless the applicant gives and maintains bond, with adequate

security "for the protection of the public against injuries proximately caused by the

negligence of such motor carrier, its servants, or its agents."  *OCGA § 46-7-12 (a).*

*(Emphasis Supplied)*[15]   In lieu of bond, the certificate holder may file a policy of

indemnity insurance which is approved by the commission and substantially conforms

to all the statutory provisions relating to bonds (§ 46-7-12 (c)), or the commission

may permit a motor common carrier to self-insure.  *OCGA § 46-7-12(d).*  Whatever

means the common carrier chooses to evidence its potential financial responsibility

to the motoring public, the bond, insurance, or self-insured plan "is a direct and

primary obligation" to any person who sustains actionable injury or loss as a result

of the negligence of the common carrier or its agents.  *Great American Indemnity Co.*

*v. Vickers, 183 Ga. 233, 236, 188 S.E. 24 (1936).*  Stated another way, the purpose of

the insurance "is not for the benefit of the insured [motor common carrier] but for the

sole benefit of those who may have a cause of action for damages for the negligence

of the motor carrier, "making the insurance policy" in the nature of a substitute surety

bond [which] creates liability in the insurer regardless of the insured's breach of the

---

[15]This emphasis is important because the required surety bond arises out of
the negligent acts of the motor carrier, its servants or its agents.

conditions of the policy. [Cit.]" *Progressive Cas. Ins. Co. v. Bryant*, *205 Ga. App. 164, 165, 421 S.E. 2d 329 (1992)*.

Because of the provisions of O.C.G.A. § 46-7-12, Georgia law is unique. Under the provisions of O.C.G.A. § 46-7-12, a Plaintiff suffering from injury may, at his election, join either a driver/agent, the carrier and/or the insurance carrier for the carrier to a lawsuit or any one of such parties may be sued alone and thereby bind an insurance company for payment of the eventual judgments.  *Spicer v. American Home Assurance Company*, *292 F. Supp. 27 (N.D. Ga. 1967, aff'd 402 F. 2d 988 5th Cir. 1968)*.  O.C.G.A. § 46-7-12 is not pre-empted by federal law.  *Watkins v. H. O. Croley Granary*, 555 F. Supp. 458 (N.D. Ga. 1982).  Thus, because of the existence of O.C.G.A. § 46-7-12, in Georgia, unlike other jurisdictions,  it is not necessary that a Plaintiff obtain a judgment against the named insured of a  motor carrier.[16]  Because O.C.G.A. § 46-7-12 gives the Plaintiff the right to sue either a driver/agent, the carrier

---

[16]Were it not for O.C.G.A. § 46-7-12 and the Spicer opinion (which was rendered here in the Norther District of Georgia) Plaintiff would agree that some jurisdictions would require that he obtain a judgment against T. I. Wood, the named insured, before being able to collect on his judgments.  As set forth on pp. 41-42 infra, however, other Courts do not require this.  In Georgia, the only jurisdiction that matters, a judgment against a driver/agent alone is fully enforceable against the insurance carrier, and no judgment against the named insured is required,  particularly since federal law does not pre-empt O.C.G.A. § 46-7-12.

and/or the insurance carrier separately or jointly at his sole election, under the provisions of the Georgia direct action statute, a judgment against any of these shall be binding against the insurance carrier as a matter of law. *See* Spicer v. American *Home Assurance Company, supra.* Thus, when defendant cites authority from other legal jurisdictions, the Court must recognize that the law from other jurisdictions has no applicability to Georgia given the direct action statute which controls this case. Accordingly, the requirements of Georgia law regarding public filings, proof of coverage, proof of cancellation, etc. are valid even in cases involving interstate carriers. *Williams v. Southern Drayage, Inc.*, 213 Ga. App. 895, 446 S.E. 2d 758 (1994).

It is undisputed at this point that the Progressive Preferred Insurance Company Indemnity issued to T.I. Wood Enterprises, Inc. a policy of insurance in 2003 with coverage of $1,000,000.00. *See Exhibit A*. Plaintiff contends that the BMC-91X filing amended the applicable policies by operation of law (via the MCS-90 endorsement) to provide coverage for the trucks leased by T. I. Wood Enterprises, Inc. from J&J Trucking. *See Exhibit D; Stipulation; Progressive's Counterclaim; ¶ 36*. Additionally, based on the federal and state legal authority cited herein, because the trucks were leased, the drivers became statutory employees of T. I. Wood

28

Enterprises, Inc. and consequently would be considered as insureds under the policies as amended by the MCS-90 form.

Because of the strong public policy to provide protection to the motoring public, the PSC, pursuant to its statutory power to adopt rules and orders necessary to enforce the statutory scheme promulgated Rule 1-8-1-.01 of the Rules of the Georgia Public Service Commission.  It provides:

> No motor carrier subject to the provisions of the Motor Carrier Act of 1931. . . shall engage in the intra-state or interstate or foreign commerce, and no certificate or permit shall be issued to a motor carrier . . . unless and until there shall have been filed with and approved by the Commission a surety bond, policy of insurance (or certificate of insurance in the form prescribed herein in lieu thereof), . . . in not less than the amounts hereinafter prescribed, conditioned to pay, within the amount of such surety bond, policy of insurance (or certificate of insurance in the form prescribed herein in lieu thereof), . . . any final judgement recovered against such motor carrier for bodily injuries to or the death of any person resulting from the negligent operation, maintenance, or use of motor vehicles under such certificate or permit, or for loss or damage to property of others . . . regardless of whether such motor vehicles are specifically described in the policy or not.

PSC Rule 1-8-1-.01 allows insurers to file the certificate of insurance form E in lieu of filing the actual policy, the existence of which is mandatory under O.C.G.A. § 46-7-12.  The certificate of insurance is not an insurance policy, but merely serves

to assure the PSC that the motor carrier has complied with the requirement of providing either a surety bond or insurance for the protection of the motoring public. By filing the required Form E certificate, the insurer certifies to the PSC that it "has issued a policy . . . of insurance effective from [a stated date] and continuing until cancelled . . . by . . . giving thirty (30) days notice to the . . . [PSC]. (Emphasis Supplied.)   As reflected below, the Notice of Cancellation, in Georgia, is only effectuated by filing a Form K with the State.

The quoted portion of Rule 1-8-1.-01 requires that a motor common carrier have a surety bond or insurance policy or certificate of insurance (the Certificate E) which provides injured members of the motoring public with financial recompense for bodily injury or death caused by a motor carrier's vehicle, even if the motor carrier's vehicle which caused the injury was not specifically described in the policy of insurance.  The rule goes on to set out the minimum limits of the liability of the insurer or bonding company for each motor vehicle involved in an accident: $100,000 for bodily injury to or the death of one person, with a $300,000 limit for bodily injuries to or death of all persons injured or killed in any one accident.  It is clear that Rule 1-8-1.-01 requires the motor common carrier to provide proof of financial responsibility for injuries sustained by the public due to any and all vehicles operated

30

on behalf of an insured motor carrier even if not specifically described in the policy of insurance executed by the insurer and the motor carrier.  Thus, the state required minimum limits of $100,000/$300,000 apply to <u>each</u> leased motor vehicle responsible for injuring a member of the public.  Here, there are two leased trucks involved, the drivers of which are alleged to have both been negligent.  Thus, for each State form Certificate E of record, there would be $200,000 in minimum coverage for <u>each</u> <u>truck</u>: $100,000 for the estate's claim and $100,000 for the wrongful death claim.  *<u>See</u>* *Driskell v. Empire Fire and Marine Ins. Co., 249 Ga. App. 56, 62-63, 547 S.E. 2d 306 (2001)*.  Because <u>two</u> trucks inflicted the damages in this case, there would be $400,000 in minimum coverage per <u>each</u> Certificate E filed of record.  Here there are <u>two</u> Certificate E forms of record filed by Progressive, thus there would be a minimum of $800,000.00 in Form E coverage available to cover Plaintiff's damages <u>assuming</u>  the two policies at issue (each of which were amended by the required MCS-90 form) do not themselves provide coverage. Plaintiff contends, however, that the amended policies do provide coverage for the six separate judgments obtained against the agents of T. I. Wood Enterprises, Inc.

**C.**     **<u>Progressive is Liable to the Plaintiffs Under the 2003 Policy as Amended by the MCS-90.</u>**

There can be no debate in this case but that Jerry Yarbrough d/b/a J&J Trucking and Excavation and/or J&J Trucking and Excavating and his two drivers were the agents of T. I. Wood Enterprises, Inc.  As set forth above, under State law, anyone who leases a commercial vehicle in the State of Georgia, by operation of law, must assume complete control of the daily operations of such vehicle including, but not limited to compliance with applicable safety regulations, provision of insurance and assumption of any responsibility or liability to the public.  The delegation of such responsibilities by the lessee to the lessor is prohibited under Georgia law.  *See* Exhibit P, PSC Regulations 8-3.1(b).  The same statutory liability is true under Federal law.  There is no independent contractor argument available to T. I. Wood Enterprises, Inc. despite her self-serving testimony to the contrary.  Simply stated, Jerry Yarbrough and his two drivers were the statutory employees and agents of T. I. Wood Enterprises, Inc. as a matter of both state and federal law.

In her deposition taken in this case, Tammy Woods identified a Truck Rental Agreement between herself and Jerry Yarbrough.  *Wood depo.; Exhibit 6.*  She also identified her accounting records which clearly indicates that beginning in March of 2003 and continuing through August of 2003, she used Jerry Yarbrough and his trucks on eight (8) separate occasions.  *Wood depo. pp. 24-37; Exhibit 7.*  Per the

accounting records she identified, on each separate occasion, T. I. Wood Enterprises, Inc. classified the payments to Mr. Yarbrough for the use of his trucks and drivers as a "equipment rental" expense.  Moreover, relative to the work Mr. Yarbrough and his drivers were doing on the date of the subject incident, the check made payable to him was also for "truck rental."  *Wood depo. pp. 26-32; Exhibit 10.*  Accordingly, even though Ms. Wood described Mr. Yarbrough as an "independent contractor" in her deposition,  it is beyond dispute that Jerry Yarbrough and his two drivers were the statutory employees and agents of T. I. Wood Enterprises, Inc.[17]

Per the pleadings filed in this case, Progressive was on notice that Plaintiff contended that Jerry Yarbrough and his drivers were the statutory employees and agents of T. I. Wood Enterprises, Inc.  On January 28, 2004, Plaintiff's counsel sent to Mimi Sewell the claim representative for Progressive, a certified letter pursuant to

---

[17]Despite the existence of a Truck Rental Form relative to Yarbrough (Wood depo, Ex. 6) and the payment to him for the HBW work classified as a "Truck Rental" expense, (Wood depo., Exhibits 10 and 10a)  Ms. Wood tried to deny that a rental agreement was actually in place.  She rationalized that the reference to truck and equipment rental on the documents did not matter because she considered Mr. Yarbrough to be an independent contractor.  (Wood depo. pp. 100-103).  She admitted, however, that her company charged its client HBW Development $1,000.00 for the work done by Yarbrough's drivers on the date of the subject incident, but only paid Yarbrough $720.00, thereby retaining $280.00 under the business arrangement.  (Wood depo., pp. 52-58).

33

O.C.G.A. § 33-7-15(c) notifying her of Plaintiff's contentions. *See Exhibit K.* Ms. Sewell was provided with a copy of the Complaint in the Cobb County Superior Court action. Thus, there can be no legitimate argument that the defendant did not know that Plaintiff contended that Jerry Yarbrough and his drivers were the statutory agents and employees of T. I. Wood Enterprises, Inc. Because they, in fact, were the statutory agents and employees of T. I. Wood Enterprises, Inc., once defendant received this notice, it had to make a decision whether it would offer a defense to these individuals, protect its own interests or otherwise take any action whatsoever.[18]

Once an insurance carrier is placed on notice of its potential exposure in a case, of course, it is free to make whatever legal judgment it decides is in the best interest of itself and/or it putative insureds. However, failure to act is not without consequences. The defendant decided not to enter a defense for its statutory agents and employees and also decided not to file a Declaratory Judgment with respect to Plaintiff's contentions that Jerry Yarbrough and his drivers were the statutory employees and agents of T. I. Wood Enterprises, Inc. Accordingly, because this is a diversity action controlled by state law, under Georgia law the defendant is bound

---

[18]Progressive did elect to provide counsel for T. I. Woods in the State Court action below but ignored Yarbrough, Cleckner and Burnham despite the statutory notice.

by the judgments obtained in the Superior Court action.  *See McCraney v. Fire & Cas. Ins. Co. of Conn., 182 Ga. App. 895, 357 S. E. 2d 327 (1987); Atlanta Cas. Co. v. Gardenhire, 248 Ga. App. 42, 545 S. E. 2d 182 (2001).*[19]

Whether required to provide MCS-90 coverage or not, the undisputed fact remains that Progressive filed a BMC-91X form (confirming the existence of the required MCS-90 endorsement) on behalf of its insured T. I. Wood Enterprises, Inc. Because of these filings, the Plaintiff contends that the case at bar is controlled by the Georgia Supreme Court opinion of *Progressive Insurance Company v. Rameriz, 277 Ga. 392, 588 S. E. 2d 751 (2003).*  In that case, the court was asked by Progressive to construe limiting language in its policy which is identical to that contained in the policy issued to T. I. Wood Enterprises, Inc.  The court refused to do so because it found that there was coverage for the vehicles involved in that incident under the terms of that Progressive policy.  Having made this finding, the court held that it was

---

[19]Even if the defendant had no duty to provide a defense to Yarbrough and his two drivers, the defendant clearly had the right to do so since it was placed on notice of Plaintiff's contentions and because of their legal exposure.  Just as Progressive entered a defense for T. I. Woods under a reservation of rights, it had the same right relative to Yarbrough and his two drivers.  The failure of the defendant to act binds it to the Judgment as to all material findings.  *See Ridgway v. Gulf Life Ins. Co., 578 F. 2d 1026, 1029 (5th Cir. 1978), (construing Georgia law).*

not necessary to consider the limiting language within Progressive's policy that purported to limit the coverage to that required by "applicable filings." In this case, whether legally required or not, since the Progressive policy was, in fact, amended by the filed MCS-90 form (*See Progressive Counterclaim; ¶ 36; Stipulation of Facts)*, there is coverage for both of the trucks involved since they were both acting as driver/agents of T. I. Wood Enterprises, Inc. If, for any reason, this court should disagree, then in that event, the court will have to construe the "limiting" language in Progressive's policy. Plaintiff contends that the limiting language is ambiguous and that it must be construed in favor of the Plaintiff. *See Alley v. Great American Ins. Co., 160 Ga. App. 597, 599, 287 S.E. 2d 16, 18-19, 501 S.E. 2d 53 (1998); Claussen v. Aetna Cas. & Sur. Co., 259 Ga. 333, 336, 380 S.E. 2d 686, 687-89 (1989).*

The applicable provision is found on page 15 and 16 of the Progressive policies and reads as follows:

**LIMIT OF LIABILITY**

"Regardless of the number of insured autos, separate premiums paid, insureds, claims made, vehicles involved and lawsuits brought, we will pay no more than the Limit of Liability shown for this coverage in the Declarations, <u>subject to the</u>

following:

1.    COVERAGE REQUIRED BY FILINGS:

If we are required by any applicable filing which we have made
on your behalf to provide coverage not otherwise provided by this policy
under this PART 1 - LIABILITY TO OTHERS, to any person or
organization, the coverage provided hereunder for such persons shall be
the minimum coverage required by law.  If we are required to make any
payment under this policy that would not have been made except for the
certification, you must reimburse us." (Emphasis supplied) *See Exhibit
A.*

As set forth above, the minimum amount of liability protection for personal

injuries for a federally registered motor carrier is $750,000.00.   *See* 49 C.F.R.

1043.2(b)(2).   The minimum required by state law is $100,000.00 per person,

$300,000.00 per accident, per vehicle.   *See* Georgia PSC Rule 1-8-1.-01.

Nonetheless, the language utilized by Progressive in its policy is ambiguous for a host

of reasons.  First, the language of the policy is circular.  It appears that the intent of

the language was to reduce Progressive's exposure (which are otherwise $1 million)

to the statutorily required filing minimums for any particular accident.  However, if

that intent is to be legally effectuated, it must be done so under this language which

is contained within the policy.  If language within the policy controls, then the

coverage is provided by the policy, not the filings. *See Progressive Insurance*

37

*Company v. Ramirez, supra.* (And this <u>policy</u> had been amended by the MCS-90 to provide coverage for the non-owned vehicles.  <u>See</u> <u>Stipulation of Facts</u>.)  Indeed, the exact language within the body of this ambiguous provision reads:  "<u>the</u> <u>coverage</u> <u>provided</u> <u>hereunder</u> for such person<u>s</u> shall be the minimum coverage <u>required</u> <u>by</u> <u>law.</u>".  Thus, since the coverage for such person<u>s</u> is "provided hereunder," by definition, it is provided under the policy.  This language therefore, incorporates <u>within</u> <u>the</u> <u>policy</u> the coverage "<u>required</u> <u>by</u> <u>law</u>" for such person<u>s</u>.[20]  Thus, the policy language controls, not the law pertaining to the applicability of federal and state mandatory surety coverage.

The language at issue is doubly ambiguous because it does not define what is meant by the "minimum coverage required by law."  This can reasonably  be read in several ways.  As set forth above, the minimum amount of liability protection for personal injuries for a federally registered motor carrier is $750,000.00.  This is the minimum <u>coverage</u> required by federal law.  While the intent may have been for this

---

[20]The Court is reminded that the Plaintiff in two separate capacities (individually and as Administrator of his decedent wife's estate) has valid Judgments against three (3) different persons, each of which were adjudged to be jointly <u>and</u> <u>severally</u> liable to him.  See Exhibit C.  Therefore, with respect to the six judgments obtained, Plaintiff may collect all he wishes from each (or all three) up to the full amount of his damages.

language to refer to the minimum coverage required for a particular vehicle, a particular shipment (interstate or intrastate?) or even a particular accident, this policy provision is completely <u>silent</u> as to exactly which legal requirement is referenced. (The Heading of the Section, however, reads as: <u>Coverage Required by Filings</u> which by definition precedes any accident and is the required authorization for the carrier to legally operate.)  There is also <u>no reference</u> to either state or federal law, although there is a reference to filings (plural) and <u>any</u> filing.  Again, this is an ambiguity that must be construed against the drafter in favor of the Plaintiffs.  Provisions of contracts of insurance are strictly construed against the insurer who prepares such contracts.  *U. S. Fire Ins. Co. v. Welch*, *163 Ga. App. 480 (294 S. E. 2d 713) (1982).*[21]

Progressive elected to file proof of policy <u>coverage</u> in the amount of $1 million with both the state and federal government.  The language on page 15 and 16 states that if we are required by <u>any</u> <u>applicable</u> <u>filing</u> to provide coverage, then the coverage "provided hereunder for such person<u>s</u> shall be the minimum coverage 'required by law.'"  Because the language can be construed to apply to <u>both</u> the federal and the

---

[21]In *Ramirez*, the court held that the limiting language at issue was irrelevant to the facts involved in that action.  Accordingly, the Court was not called upon to address the possible ambiguity of the language nor its applicability to a different set of facts.  To the best of counsel's belief, this Court may be the first Court called upon to rule upon the construction of this ambiguous language.

state filings (i.e. coverage required by filings (plural) and any applicable filing), the

Plaintiff contends that under the rules of construction for insurance policies the

language is required to be read in such a manner as to mean that it does refer to both

the state and federal filing coverage limits.  *Id. at 481.*  Additionally, because the

persons for whom coverage is required are identified in the plural, Plaintiffs would

further contend that the coverages would apply to Yarbrough individually and to each

of his two drivers as they all three individually were found to be  jointly and severally

liable to the Plaintiff in both of his capacities.  Had the "limiting" language not

incorporated within the policy all applicable filings, the Court would not need to

construe the meaning of the ambiguous policy.  Progressive chose the language,

incorporated the filings coverage back into the policy and therefore has required

construction of the policy itself instead of examination of the filing limits alone (as

it will undoubtedly contend in response to Plaintiff's Motion).  This admittedly

results in a windfall for the Plaintiff but this was Progressive's decision.

Finally, it is Progressive which has utilized circular and ambiguous language

in its policy that provides the coverage  for Plaintiff's damages, that being the

coverage provided hereunder by any applicable filing (state and federal) for all such

persons.[22]   If this Court finds that the filed MCS-90 did not amend the underlying

policy to cover the non-owned vehicles involved in the subject collision, and that the

policy limits of $1 million do not automatically apply under the *Ramirez* case because

of the hereunder language, the Plaintiff would alternatively contend that Progressive's

federal and state filings each apply (given the language utilized by Progressive) and

that the Plaintiff is entitled to $750,000.00 under the federal filing and an additional

$200,000.00 under the state filing for a total of $950,000.00 per person (the

persons).[23]  Of course, under this analysis, collectively this is more coverage than the

$1 million policy limits otherwise applicable; nonetheless, this is what the policy

provides.[24]  The language utilized does not accomplish the intended result but this is

not fault of the Plaintiff and must be construed against the drafter.  *See Great*

*American Ins. Co., supra.*

_____

[22]Does not any mean just that - both state and federal?

[23]The "subject to" language may reasonably be construed to eliminate that
language which went before it, therefore, given the joint and several judgments
obtained against three different agents/insureds, this amount of coverage would
apply to each of the six judgments obtained.

[24]The ambiguous provision plainly seeks to alter otherwise applicable limits
on liability coverage.  Whether intended or not, the "subject to" language utilized
actually increased the limits for this case to $950,000.00 per person or $2.85
million per policy.

Even though Plaintiff has no judgment against T. I. Wood Enterprises, Inc., *per se*, legally this does not matter. *See Spicer v. American Home Assurance Company Co., 292 F. Supp 27 (N.D. Ga. 1967) aff'd 402 F. 2d 988 (5th Cir. 1969); Pierre v. Providence Washington Insurance Company, 99 N.Y. 2d 222, 785 N.E. 2d 52 (2002); Royal Indemnity v. Jacobsen, supra.; Adams v. Royal Indemnity, supra.; Nationwide Mutual Ins. Co. v. Holbrooks, 187 Ga. App. 706, 371 S.E. 2d 252 (1988).*[25]  Plaintiff has a judgment against the statutory agents and employees of T. I. Wood Enterprises, Inc.  Further, as set forth herein, if the Court is not persuaded by the logic of the cases cited and/or the *Gardenhire* state court opinion, nonetheless, the Plaintiff has again demonstrated in this case, based on the record in this case, that indeed Jerry Yarbrough and his drivers were the statutory agents and employees of T. I. Wood Enterprises, Inc.  See depo of Tammy Wood, Exhibits 6, 7, 9, 10 and 10a.  Thus, there is liability as a matter of law.  *Id.* [26]

---

[25]The *Spicer* opinion, decided in the Northern District of Georgia, was affirmed by the Fifth Circuit which characterized the logic of the opinion as being "completely unassailable." *Spicer* specifically held that a judgment against a driver-agent was fully enforceable against the principal's insurance carrier.

[26]Even if Plaintiff had a judgment against T. I. Wood Enterprises, Inc., Progressive would undoubtedly still contend that there is no coverage under its policy because the policy (without amendments by the MCS-90) does not provide coverage for non-owned vehicles.  See Exhibit A, definition of accident, p.5.  But

Progressive is bound by the judgment obtained against statutory agents and employees of its insured because it failed to take action after being notified by the Plaintiff of Plaintiff's contentions under O.C.G.A. § 33-7-15(c). *Atlanta Cas. Co. v. Gardenhire, supra.* Even if not bound by the judgment below, nonetheless, because the Plaintiff has proven in this case, once again, that Jerry Yarbrough and his drivers were the statutory agents and employees of T. I. Wood Enterprises, Inc., there can be no question about the legal liability of T. I. Wood Enterprises, Inc. for the acts of such statutory agents and employees. Once again, in this lawsuit, the negligence of these dual agents has been demonstrated and is not in dispute. *See Exhibit N, M, and O; Depositions of Gary Lacey, Olin Ford, and Officer Ellege; Exhibits X, Y and Z.*

The general rule is that because there is no privity of contract, a party may not bring a direct action against the liability insurer of the party who allegedly caused the damage unless there is an unsatisfied judgment against the insured or it is specifically permitted either by statute or provision in the policy. *Bacon v. Liberty Mut. Ins. Co., 198 Ga. App. 436, 401 S.E. 2d 625 (1991).* The rationale for the prohibition of direct actions against insurers is that the injured party is not in privity of contract with the

---

the policy was amended by the state and federal filings which coverages are incorporated within it per language found on pages 15-16 of the policy.

insurer and may not maintain a direct action on the contract for payment of a claim unless the judgment obtained against the insured under the liability policy remains unsatisfied. *Jenkins and Miller, Ga. Auto. Ins. Law (1997 ed.), § 6-1.* In the case at bar, the Plaintiff has an unsatisfied judgment against an agent of the named insured of the Progressive Preferred Insurance Company, Jerry Yarbrough d/b/a J&J Trucking and Excavation and/or J&J Trucking and Excavating, as well as two drivers employed by Mr. Yarbrough. Additionally, under the provisions of O.C.G.A. § 46-7-12(e), the Plaintiff was entitled to file a direct action against Progressive in this Court as a matter of law should there be any need to re-litigate that issue.

**D.   The 2001 Progressive Policy Must be Stacked Onto the 2003 Coverage.**

At this juncture, the Court is reminded that there was a second policy issued by Progressive in 2001 which was not cancelled in conformity with the requirements of Georgia law (via the filing of a form K). Because of the continuous coverage doctrine adopted by the State of Georgia, that coverage must be stacked on top of the 2003 coverage, whatever this Court determines the 2003 coverage to be. Georgia law specifically allows the stacking of such continuous coverage onto other coverage. *See Dehart v. Liberty Mutual Insurance Company, 270 Ga. 381, 509 S.E. 2d 913 (1998).*

The continuous coverage doctrine was initially described over 30 years ago in the case of *Smith v. National Union Fire Insurance Co., 127 Ga. App. 752, 753, 195 S. E. 2d 205 (1972)* and was reaffirmed by the Georgia Supreme Court in the case of *DeHart v. Liberty Mutual Insurance Company*, <u>*supra*</u>.   In these opinions, the Court held that once a Certificate E is filed of record with the State, that <u>the</u> <u>policy</u> <u>of</u> <u>insurance</u> remains in effect and cannot be cancelled until the State is notified that the policy has been cancelled.  The manner and method by which the State is so notified is through the filing of a Form K.  In this case, Progressive did not filed a Form K on the policy issued in the calendar year 2001.  <u>*See*</u> *Exhibit V, Certified Georgia DMVS records re: T. I. Wood.*  Thus, the 2001 policy remained in full force and effect.  <u>*See*</u> *Progressive Preferred Insurance Company v. Ramirez*, <u>*supra*</u>.

The position taken by the Plaintiff in this case is not new in any way.  Indeed, in <u>*Elliott v. Leavitt*</u>, *122 Ga. App. 622, 631-632, 178 S.E. 2d 268 (1970)*, the court held that an insurance company that had not effectively cancelled its coverage at the time of a collision, despite the expiration of a policy, could still be named as a proper defendant in a wrongful death action.  In that wrongful death case, since the insurance company did not give the required notice of cancellation to the Commission, <u>it</u> <u>was</u> <u>legally</u> <u>obligated</u> <u>to</u> <u>pay</u> <u>the</u> <u>Plaintiffs</u>.

45

Even if the policy at issue may not have been enforceable between the parties as of the date of the subject collision, it remained in force concerning the public. Again, this doctrine has also <u>long been recognized</u> by the Courts where the interest of the innocent members of the motoring public are involved. *See* <u>Smith v. National Union</u>, *127 Ga. App. 752, 753-754, 195 S.E. 2d 205 (1972);* <u>Garden City Cab Company v. Fidelity and Casualty Company</u>, *80 Ga. App. 850, 854, 57 S.E. 2d 683 (1950).*

Regardless of how the Court decides the 2003 Progressive policy ambiguity construction issue, therefore, the Court still has to look at the continuous coverage arguments of Plaintiff to determine how much coverage would be provided under the earlier 2001 policy issued by Progressive.  Under the *Ramirez* case that question must be answered in Plaintiff's favor for the full $1 million in policy limits.   As the Court in *Ramirez* wrote:

> "When a Form E Endorsement filed with the PSC provides that an insurance company has issued its insured an insurance policy and the policy lapses before an incident giving rise to liability on the part of the insured and before proper notice of cancellation is given to the PSC, the insurer's liability to a third party injured by the insured is based on the policy itself as opposed to liability based on the minimum coverage imposed by law."

<u>Id.</u> *at 395.*

46

The *Ramirez* Court also found ineffective any argument that limiting language in the policy (identical to that involved here) could reduce the carrier's obligations to the public. *Id. at 394-395.*  Again, federal law is not pre-empted by Georgia state law.  The Georgia direct action statute and the regulations passed thereunder control in this case because the underlying collision occurred in the State of Georgia.  As set forth herein, under Georgia law, there is no cancellation of the policy unless a Form K is filed with the State of Georgia.  Because there was no Form K filed under Georgia's  continuous coverage doctrine, Progressive's earlier policy remains in full force and effect via its uncancelled Certificate E filed with the State and can be stacked onto the other coverage.

It is anticipated that Progressive may attempt to seek refuge in the opinion of *Ross v. Stephens, 269 Ga. 266, 496 S.E. 2d 705 (1998).*  That case is distinguishable for a host of reasons.  First, there was no evidence in *Ross v. Stephens* that federal BMC-91X and MCS-90 endorsements were of record at the time of the incident. Secondly, there was no evidence in *Ross v. Stephens* that the carrier had utilized the ambiguous limiting language involved in this policy wherein the insurer specifically promised to its insured that coverage would be provided hereunder - *i.e.* - under the

policy.  There was also no evidence in *Ross v. Stephens* that the carrier at issue had

operated in interstate commerce as the Trial Court found in its Order.  <u>*See*</u> Exhibit C.

In this case, <u>the policy</u> was amended by the federal endorsement to provide coverage

for the vehicles thus distinguishing the *Ross* case completely.  In short, in *Ross v.*

*Stephens*, the Court did not have to deal with the issues involved in this case.

Given the express holding by the Georgia Supreme Court in *Ramirez*, even if

the Plaintiff  were somehow limited to either of the minimum coverages under state

or federal law (rather than both) for the 2003 Progressive policy in effect at the time

of the subject incident, with respect to the earlier 2001 Progressive policy which was

not properly cancelled, per <u>*Ramirez*</u>, the amount of coverage available to the Plaintiff

would be the face amount of the <u>policies</u>.[27]

## CONCLUSION

There are no genuine issues of material fact <u>in this case</u>: Jerry Yarbrough and

his two drivers were and are the statutory employees <u>and</u> <u>agents</u> of T. I. Wood

Enterprises, Inc. and were responsible for the death of Melissa Kolencik.  This was

proven in the State action below and has been proven <u>again</u> in this case.  Accordingly,

---

[27]Of course, this assumes the Court does <u>not</u> find Progressive's policy to be ambiguous as written.  If the Court does find there is an ambiguity, this would increase the coverages for the earlier policy for the same reasons set forth above.

under *Spicer v. American Home Ins. Co., supra.* (which affirmed judgments against driver <u>agents</u> as being binding against the principal's insurer) and because there is no genuine issue of fact concerning liability for the death of Melissa Kolencik, Summary Judgment should be granted on Counts One and Three with the only issue remaining being the amount of coverage under the two policies at issue (and the state and federal filings) available to satisfy the six Judgments obtained, the subject of Court Two.

With respect to the Declaratory Judgment action, based on the authority cited above, the Plaintiff contends at a minimum that Progressive's primary 2003 policy was amended by the BMC-91X and MCS-90 forms to provide $1 million in coverage for the leased trucks at issue. The Plaintiff further contends that the earlier 2001 Progressive policy which had not been effectively cancelled under state law (via a form K filed of record with the Georgia PSC) was also in effect under the continuous coverage doctrine of Georgia law and provided the same amounts of coverage. Consequently, the Plaintiff contends that there are two Progressive policies still in force and effect which provide coverage for this incident since both policies had been amended by operation of law by a Form MCS-90 at the time of issuance to provide coverage for the leased trucks. Therefore, Plaintiff seeks Judgment on Count One in

the minimum amount of $2 million, plus interest on the full amount of the Judgments. Alternatively, the Plaintiff would ask that the Court construe the Progressive ambiguous policy language in favor of the Plaintiff and declare as a matter of law that the coverage is $950,000.00 per insured (Yarbrough, Cleckner and Burnham as agents) per policy (2003 and 2001) for a total of $5.7 million ($2.85 million for each of the two policies involved), plus interest.

This the 3rd day of August, 2005.

> s/Richard W. Hendrix, Esq.
> Georgia State Bar No. 346750
> Audrey E. Mitchell
> Georgia State Bar No. 005407
> Counsel for Plaintiff
> FINCH McCRANIE, LLP
> 225 Peachtree Street, NE
> 1700 South Tower
> Atlanta, Georgia 30303
> Telephone: (404) 658-9070
> Email: rhendrix@finchmccranie.com

This certifies that pursuant to LR 5.1, N.D., GA, the above and foregoing

**Brief in Support of Motion for Summary Judgment** has been prepared using

Times New Roman font, 14 point.

This the 3rd day of August, 2005.

s/Richard W. Hendrix, Esq.
Georgia State Bar No. 346750
Audrey E. Mitchell
Georgia State Bar No. 005407
Counsel for Plaintiff
FINCH McCRANIE, LLP
225 Peachtree Street, NE
1700 South Tower
Atlanta, Georgia 30303
Telephone: (404) 658-9070
Email: rhendrix@finchmccranie.com

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

ROBERT J. KOLENCIK, Individually   :
and as ADMINISTRATOR of the   :
ESTATE OF MELISSA KOLENCIK,   :
   : CASE NO. **1:04-CV3507-JOF**
      Plaintiff,   :
   :
      vs.   :
   :
PROGRESSIVE PREFERRED   :
INSURANCE COMPANY, and   :
GULF INSURANCE COMPANY,   :
   :
      Defendants.   :

## CERTIFICATE OF SERVICE

I hereby certify that I have on August 3, 2005electronically filed Plaintiff's

Brief in Support of Plaintiff's Motion for Summary Judgment with the Clerk of Court

using the CM/ECF system which will automatically send email notification of such

filing to the following attorneys of record:

      Scott W. McMickle and
      Michael L. Morgan

                        s/Richard W. Hendrix, Esq.
                        Georgia State Bar No. 346750
                        Audrey E. Mitchell
                        Georgia State Bar No. 005407
                        Counsel for Plaintiff

FINCH McCRANIE, LLP
225 Peachtree Street, NE
1700 South Tower
Atlanta, Georgia 30303
Telephone: (404) 658-9070
Email: rhendrix@finchmccranie.com