IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ROBERT J. KOLENCIK,                          :
Individually and as Administrator            :
of the Estate of Melissa Kolencik,           :
                                             :
        Plaintiff,                          :
                                             :     CIVIL ACTION NO.
      v.                                  :     1:04-CV-3507-JOF
                                             :
PROGRESSIVE PREFERRED                        :
INSURANCE COMPANY,                           :
                                             :
        Defendant.                          :

## OPINION AND ORDER

This matter is before the court on Plaintiff's motion for summary judgment [35-1], Plaintiff's motion for leave to file excess pages [36-1], Defendant's motion for leave to file excess pages [37-1], Defendant's motion for summary judgment [38-1], and Plaintiff's motion for leave to file excess pages [41-1].

I.      **Background**

      A.      **Procedural History and Facts**

Plaintiff, Robert J. Kolencik, individually and as administrator of the estate of Melissa Kolencik, filed suit against Progressive Preferred Insurance Company and Gulf Insurance Company on December 1, 2004, under the terms of Defendants' insurance policies to recover

the full judgment awarded to Plaintiff against one of Defendants' insureds in a state court personal injury action.   Alternatively, Plaintiff also filed a declaratory judgment action in Count II of his complaint seeking a declaration of the amount of coverage owed by Defendants under their insurance policies or, pursuant to O.C.G.A. § 46-7-12, a direct action against Defendants for injuries suffered by Melissa Kolencik.   Plaintiff voluntarily dismissed Gulf Insurance Company on September 21, 2005.   Shortly thereafter, the parties filed the instant cross-motions for summary judgment.

On August 27, 2003, Melissa Kolencik was killed when the vehicle she was driving was involved in an accident with two dump trucks operated by Kenneth Burnham and Darlene Sue Cleckner.   Burnham and Cleckner were employees of Jerry Yarbrough, d/b/a J&J Trucking and Excavating.   On the day of the accident, Burnham and Cleckner had been hauling dirt from Cartersville, Georgia to a dump site in Acworth, Georgia, for a company called T.I. Wood Enterprises, Inc.   T.I. Wood, in turn, was working for HBW Development Company, a developer that was building an apartment complex near Cartersville.   T.I. Wood and Yarbrough had a business arrangement – the characterization of which is in dispute – whereby T.I. Wood rented trucks from Yarbrough from time to time.   As a result of the accident, Cleckner pled guilty to criminal charges of following too closely, hit and run, and vehicular homicide. Yarborough pled guilty to permitting his drivers to drive his trucks despite his knowledge of violations of numerous federal safety violations.

2

On the day in question, the two dump trucks finished their work at the HBW site at 6:30 p.m. and were proceeding to gas up the trucks prior to stopping at a campground where Yarbrough was providing overnight accommodations for the drivers so that they could resume work the next day.  *See* Cleckner Depo., at 37, 43.  Cleckner testified that she got separated from the other trucks.  It was unclear from Cleckner's testimony whether she refueled her truck before circling back to see what was keeping the other trucks.  In any event, at a point close to refueling, she discovered the accident involving Melissa Kolencik, which had occurred shortly after 7:00 p.m. *Id.* at 43-45; Burnham Depo., at 31.

In her deposition, Tammy Wood, president of T.I. Wood, testified that she considered J&J Trucking to be an independent contractor.  Her accountant instructed her this would have tax advantages.  *See* Wood Depo., at 72.  Jerry Yarbrough filled out a "Truck Rental Form" for T.I. Wood listing his name, telephone numbers, insurance company, and make and model of dump trucks, but Wood testified that the "truck rental form" filled out by Yarbrough was an "informational form" only and was not actually a rental agreement.  *Id.* at 90.  A 1099 form signed by T.I. Wood shows that for the year 2003, T.I. Wood paid J&J Trucking a total of $13,186.64.  *See* Exh. 26, Wood Depo.  A register from T.I. Wood's check records shows that it accounted for the checks sent to J&J Trucking as "equipment rental."  *See* Exh. 7, Wood Depo.  The check T.I. Wood used to pay Yarbrough for his work in Cartersville had "Boyd truck rental" in the memo line.  *See* Exh. 10, Wood Depo.  Billy Boyd, a principal with HBW Management Company, testified that the job at the HBW site was to last from August 27,

3

2003 through September 5, 2003. It is undisputed that at the time of the accident, T.I. Wood, itself, did not conduct any interstate operations and did not have authority from the Department of Transportation to operate as an interstate motor carrier.

Pursuant to O.C.G.A. § 46-17-12, Plaintiff filed suit in the Superior Court of Cobb County against T.I. Wood Enterprises, Inc., Jerry Yarbrough, d/b/a J&J Trucking & Excavating and/or J&J Trucking & Excavating, Darlene Sue Cleckner, Kenneth Burnham, and Akil Nishica, Civil Action No. 04-1-00549-40. On November 18, 2004, Plaintiff secured several judgments against various defendants: (1) In his capacity as surviving spouse, Plaintiff obtained three judgments of $4 million each, jointly and severally, against Jerry Yarbrough, Darlene Sue Cleckner, and Kenneth Burnham; (2) as administrator of his wife's estate, Plaintiff obtained two joint and several judgments against Darlene Sue Cleckner and Kenneth Burnham in the amount of $1,083,210.26; and (3) as administrator of his wife's estate, he obtained a separate judgment against Jerry Yarbrough for $7,416,543.60. The total judgment against Cleckner and Burnham was $5,083,210.26, and against Yarbrough was $11,416,543.60. No judgment was entered with respect to T.I. Wood, and the state court judgment against the other defendants specifically noted that because the plaintiff had not sought summary judgment against T.I. Wood, T.I. Wood was "not required to counter plaintiff's showing and [is] not bound by the findings in this Order." *See* State Court Order, Superior Court of Cobb County, dated Oct. 7, 1994.

4

At the time of the accident, T.I. Wood was insured by Progressive Preferred Insurance Company under policy number CA 4196911-3 for the period of November 27, 2002 through November 27, 2003.   Under the 2003 Progressive policy, coverage would be paid for an "insured auto" involved in an accident.   It is undisputed that none of the trucks owned by J&J Trucking was listed on the declarations page for the 2003 Progressive policy.   As required by law, however, Progressive also filed a Form BMC-91X with the Federal Motor Carrier Safety Administration of the U.S. Department of Transportation, as well as a Form E (Uniform Motor Carrier Bodily Injury and Property Damage Liability Certificate of Insurance) with the Georgia Department of Motor Vehicle Safety which certified that T.I. Wood was insured by Progressive.

The policy also contained Form F endorsement which stated:

The Certificate to the policy, as proof of financial responsibility under the provisions of any State motor carrier law or regulations promulgated by any State Commission having jurisdiction with respect thereto, amends the policy to provide insurance for automobile bodily injury and property damage liability in accordance with the provisions of such law or regulations to the extent of the coverage and limits of liability required thereby provided only that the insured agrees to reimburse the company for any payment made by the company which it would not have been obligated to make under the terms of the policy except by reason of the obligation assumed in making such certification.

5

The 2003 Progressive policy also addresses the limits of coverage and provides:

> Regardless of the number of insured autos, separate premiums paid, insureds, claims made, vehicles involved and lawsuits brought, we will pay no more than the Limit of Liability shown for this coverage in the Declarations, subject to the following:
>
>> [i]f we are required by any applicable filing which we have made on your behalf to provide coverage not otherwise provided by this policy under this PART 1 – LIABILITY TO OTHERS, to any person or organization, the coverage provided hereunder for such person shall be the minimum coverage required by law.  If we are required to make any payment under this policy that would not have been made except for the certification, you must reimburse us.

2003 Policy, Declaration.

Progressive had also issued a policy to T.I. Wood for the year 2001.  Progressive did not file a Form K cancellation concerning this policy with the Georgia Department of Motor Vehicle Safety.  The 2001 policy is materially identical to the 2003 policy.

**B.    Contentions**

Plaintiff contends that under Georgia law, it may file a direct action against Progressive for the negligence caused by Cleckner and Burnham as "statutory employees" of Progressive's insured, T.I. Wood.   Plaintiff argues that because the insurance policy is amended by state and federal regulations, Plaintiff is entitled to recover to the full limits of the Progressive policy.   Alternatively, Plaintiff argues that he is entitled to double the state minimum recovery because two dump trucks were involved in the accident.   Finally, Plaintiff argues that because Progressive failed to file a notice of cancellation of its 2001 policy with

the State of Georgia, Plaintiff is entitled to "stack" the 2001 coverage on top of the 2003 coverage.

Progressive responds that there is no coverage under its policy because the dump trucks in question were not listed as "covered autos" under the policy.   Further, Progressive argues that it has no obligations under its federal filing because the trucking operations conducted by T.I. Wood in general and on the day in question involved purely intrastate travel. Finally, if the state filing applies here, Progressive argues that its obligation is limited to the $100,000 state minimal coverage requirement.

## II.   Discussion

Before proceeding further, it is necessary to describe the regulatory framework for the motor carrier industry at both the state and federal levels.  As the court in *White v*. *Excalibur Insurance Company*, 599 F.2d 50 (5th Cir. 1979), recognized, "[m]otor carriers had attempted to immunize themselves from the negligence of the drivers who operated their vehicles by making them all nominally 'independent contractors.'"  *Id.* at 52.  To address this problem, Congress amended the Interstate Motor Common Carrier Act to require that a motor carrier assume "full direction and control" of leased vehicles.  *Id.*  In order to effectuate this responsibility, federal law mandates that insurance policies for motor common carriers contain an "Endorsement for Motor Carrier Policies of Insurance for Public Liability Under Sections 29 and 30 of the Motor Carrier Act of 1980."  This endorsement is commonly known as the Form MCS-90.  The required language in the Form MCS-90 is standardized and

7

applies to the "operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of sections 29 and 30 of the Motor Carrier Act of 1980. Those sections apply to motor carriers engaged in interstate commerce. Thus, insurance companies who insure vehicles owned or leased by interstate trucking companies must include this endorsement in the policy. Under 49 U.S.C. § 13102 and 49 C.F.R. § 376.2, a "lease" is defined as "a contract or arrangement in which the owner grants the use of the equipment . . . to an authorized carrier for use in the regulated transportation of property." The policy embodied in these regulations "was to assure that injured members of the public would be able to obtain judgments collectible against negligent authorized carriers." *See T.H.E. Ins. Co. v. Larsen Intermodal*, 242 F.3d 667, 672 (5th Cir. 2001).

The state of Georgia has similar requirements. In order to operate as a motor carrier in Georgia, a company must first obtain a certificate of public convenience pursuant to O.C.G.A. § 46-7-3. Under rules adopted by the Georgia Public Service Commission, in order to obtain a certificate of public convenience, a carrier must provide the Public Service Commission with a surety bond of $100,000 for bodily injury or death of one person and $300,000 for the bodily injury or death of all persons involved in an accident. *See* Georgia Public Service Commission Rule 7-2.1.[1] Alternatively, the motor carrier may present the Public Service Commission with proof of insurance in the same amounts or more. The proof

---

[1]Previously, this Rule had been numerated Rule 1-8-1-.01 and is referred to as such in prior cases cited by the court in this order.

may be the actual policy itself or a certificate from the insurance company.  The certificate of insurance in Georgia is known as the Form E (Uniform Motor Carrier Bodily Injury and Property Damage Liability Certificate of Insurance).  The purpose of this insurance "'is not for the benefit of the insured [motor common carrier] but for the sole benefit of those who may have a cause of action for damages for the negligence of the motor common carrier,' making the insurance policy 'in the nature of a substitute surety bond [which] creates liability in the insurer regardless of the insured's breach of the conditions of the policy.'"   *Ross v. Stephens*, 269 Ga. 266, 267 (1998) (citations omitted).   Some insurance policies, including the one at issue here, also contain a Form F endorsement whereby the insurer agrees to provide coverage for the motor common carrier's vehicles not specifically mentioned in the declarations page of the policy, but limits the coverage of those vehicles to the state minimum requirements of $100,000 per person and $300,000 per incident, and requires reimbursement by the insured.

A.      **Status of Cleckner and Burnham**

O.C.G.A. § 46-7-12 authorizes a direct action against the insurer of a motor common carrier. Here, Plaintiff did not directly sue Progressive in the underlying state law action and, instead, made Count II of its complaint here a direct action against Progressive pursuant to O.C.G.A. § 46-7-12. The court must determine whether T.I. Wood can be held responsible for the actions of Cleckner and Burnham, employees of J&J Trucking but doing work for T.I. Wood on the day in question. As the court described above, the Interstate Motor Common Carrier Act was amended to more carefully regulate the relationship between motor common carriers and the vehicles they used. For example, the amendments require that the relationship between a lessor and lessee be set forth in writing in accordance with 49 U.S.C. § 11107(a). Each lease must set forth that the lessee has the "exclusive possession, control, and use of the equipment for the duration of the lease." The lease should also provide that the lessee "shall assume complete responsibility for the operation of the equipment for the duration of the lease." 49 C.F.R. § 1057.12(c)(1).

Here, no such written lease exists. Rather, the documentary evidence shows a truck rental form, checks made out for the purpose of equipment rental, and a register from T.I. Wood showing that the checks cut for J&J Trucking were for the purpose of truck rental. Wood testified, however, that she considered J&J Trucking to be an "independent contractor" and all other documentary evidence to the contrary was at the direction of her accountant for "tax purposes."

10

In determining whether J&J Trucking and T.I. Wood were engaged in a lessor-lessee relationship under the law, the court finds it instructive that the purpose of amending the Interstate Motor Common Carrier Act in 1956 was to prevent companies from eluding liability by engaging in sham "independent contractor" relationships.   Companies would hire uninsured, risky trucks and their drivers as "independent contractors" and then disclaim any association when those uninsured trucks and drivers caused injury to the general public.   The federal and state filing requirements were designed to provide a minimal form of coverage for the general public when insolvent and uninsured actors injured them.   *See White*, 599 F.2d at 53 ("Congress wished to impose on lessee-carriers responsibility for the operation of leased vehicles 'as if they were the owners of such vehicles.'") (citing 49 U.S.C. § 304(e)(2), now codified at 49 U.S.C. § 11107(a)(4)).   "Because the carrier now has both a legal right and duty to control vehicles operated for its benefit, the employees of the vehicle-lessor are deemed statutory employees of the lessee-carrier to the extent necessary to insure the carrier's responsibility for the public safety just as if the lessee-carrier were the owner of the vehicles." *Id.* (citing *Simmons v. King*, 478 F.2d 857, 867 (5th Cir. 1973)).

The court finds that Ms. Woods' conclusory labeling of J&J Trucking as an "independent contractor" is not sufficient to escape the legal reality that T.I. Wood treated the relationship as one of lessor-lessee through its payments and record-keeping.   Thus, Cleckner and Burnham as J&J Trucking employees were "statutory employees" of T.I. Wood for the purposes of the Interstate Motor Common Carrier Act.   *See White*, 599 F.2d at 54 ("the effort

11

of the carrier and the vehicle lessor to create by contract an independent contractor relationship cannot operate to frustrate the federal design to impose responsibility on the carrier for acts of those who might otherwise be independent contractors"); *see also Judy v. Tri-State Motor Transit Co.*, 844 F.2d 1496, 1051 (11th Cir. 1988) ("Where members of the public are injured by the torts of the drivers of leased vehicles, the traditional common law doctrine of master-servant relationships and respondeat superior does not apply.").

Georgia adopted the reasoning of *Simmons* in *Nationwide Mutual Insurance Co. v. Holbrooks*, 187 Ga. App. 706 710 (1988), so long as the accident happens while the driver is "on the business of the master." *See Wright v. Transus, Inc.*, 209 Ga. App. 771 (1993). There is no doubt on the facts presented here that Cleckner and Burnham were "on the business" of T.I. Wood because they were on their way to refuel the dump trucks and to bunk at an RV campground to prepare for the next day's work at the HBW apartment complex development. Thus, even were the court disinclined to find that Cleckner and Burnham were statutory employees of T.I. Wood under the trucking regulations, the evidence adduced shows that Cleckner and Burnham were not completed with their day's work at the time of the accident. Finding that T.I. Wood has legal liability for the actions of Cleckner and Burnham, the court next considers the extent to which the events here implicate the insurance policy issued by Progressive to T.I. Wood.[2]

---

[2]The court rejects Defendant's contention that there is any dispute of fact as to the negligence of Cleckner and Burnham. Their negligence was clearly established in the

AO 72A
(Rev.8/82)

### B.     Coverage Under the Progressive Policy

Plaintiff contends that the Progressive insurance policy, itself, is the basis for coverage of his claim.  However, there is no dispute that the dump trucks driven by Cleckner and Burnham were not listed on the declaration pages of the insurance policy issued to T.I. Wood by Progressive.  In *Ross v. Stephens*, 269 Ga. 266 (1998), the Supreme Court of Georgia addressed this very situation.  There, although the vehicle at issue was not identified in the policy's declarations, the insurer had also filed a Form F endorsement limiting the coverage of vehicles not listed on the declarations page to the state minimum requirements of $100,000 per person and $300,000 per incident.  The court concluded that because the policy did not provide coverage for the vehicle, the Form F endorsement was the basis for the insurer's liability, and the liability limits were those set forth in the endorsement.  *Id*. at 268-69.  The court found that the Public Service Rule "only describes the bond of insurance a motor common carrier must have to operate (one that is conditioned to pay a judgment regardless of whether the vehicle involved was described in the insurance policy), and sets out the minimum amount of coverage that must be provided by the bond or insurance coverage obtained by the motor common carrier.  To discern the coverage provided," the court must "look to the insurance policy and its endorsements." *Id.* at 268.  Thus, the exposure of the insurer in *Ross* was limited to the statutory requirement of $100,000.  *Id.* at 269.  *Cf.*

---

underlying state litigation and criminal charges against Cleckner.

13

*Progressive Preferred Insurance Company v. Ramirez*, 277 Ga. 392, 395 (2003) (where policy, itself, covered vehicle in question,"the insured's liability to a third party injured by the insured is based on the policy itself as opposed to liability based on the minimum coverage imposed by law").  Based on the foregoing, the court finds here that the Progressive policy, itself, is not the source of coverage, but rather the Form F endorsement is.   The court discusses below the amount of insurance coverage provided through that endorsement and the limitations of coverage discussed in the policy.[3]

### C.    Coverage under Federal MCS-90

Plaintiff also argues that the Federal Form MCS-90 endorsement amends the Progressive policy to provide additional coverage here.  As discussed above, Form MCS-90 applies only to those motor common carriers that are engaged in interstate commerce.  *See generally Century Indemnity Co. v. Carlson*, 133 F.3d 591 (8th Cir. 1998).   Thus, in *Carlson*, the issue the court addressed was whether the trip of a truck delivering a shipment of grain from Cologne, Minnesota to a large terminal on the Minnesota River in Savage, Minnesota was in "interstate commerce."   The court considered various tests for determining whether shipments were made in interstate commerce and eventually concluded that this shipment did constitute interstate commerce, and thus the federally mandated MCS-90

---

[3]The court finds that Plaintiff's reading of *Adams v. Royal Indemnity*, 99 F.3d 964, 968 (10th Cir. 1996), to state that the federal endorsement amends the policy, strains the reasoning set forth in that case and, in any event, is against the weight of authority on this point.

coverage applied.   *Id.*   Numerous other courts have similarly found that coverage allowed under the MCS-90 form is for interstate commerce only.   *See*, *e.g.*, *Progressive Casualty Insurance Company v. Hoover*, 570 Pa. 423 (2002); *QBE Insurance Company v. P&F Container Services, Inc.*, 362 N.J. Super. Ct. App. Div. 445 (2003).

In *QBE*, for example, the lower court judge had concluded that the MCS-90 endorsement applied even to a trip that was entirely intrastate simply because the carrier was a federally-registered interstate carrier.   *Id.* at 451.   The *QBE* appellate court, however, saw three alternatives to the manner in which MCS-90 should be applied:   (1) to all vehicles operated by an interstate carrier regardless of the course of the actual trip at issue, (2) only to trips that "involved" interstate commerce because the trip was only one leg of an interstate journey or because the vehicle could have been used for interstate commerce under the terms of the lease agreement, or (3) only when the trip itself either originated in or was intended to conclude out of state.   *Id.* at 452.   Ultimately, the court concluded that so long as the "leased vehicle is available to the carrier for both interstate and intrastate trips, even if the specific trip is intrastate, federal rules of financial responsibility apply, including the MCS-90 insurance endorsement."   *Id.* at 457.

This court does not even need to reach the ultimate issue of which alternative should apply here because it is undisputed that at the time of the incident that both (1) T.I. Wood did not have federal authority to operate as an interstate carrier, and (2) the trip involved on

August 27, 2003 was purely intrastate.[4]   The testimony of Tammy Wood that in 2003, none of her trucks engaged in interstate commerce because she was no longer licensed by the Department of Transportation remains undisputed.   Furthermore, the J&J dump trucks transported dirt from a building site in Cartersville, Georgia to a dump in Acworth, Georgia. The dump trucks parked in Georgia overnight in between days on the job.   There is no evidence at all of any interstate activity, unlike *Carlson* where the court had to construe whether an intrastate grain shipment could be considered interstate because the grain ultimately did cross state lines.

The court finds this case similar in nature to *Roberts v. Levine*, 921 F.2d 804 (8th Cir. 1990), where different products and different trips all commenced and completed entirely within the state.   However, one shipment involved fertilizer which would eventually be moved by rail to Canada.   The court determined that the fertilizer shipment was interstate in nature because of the Canadian destination.   In contrast, a shipment of soybeans to processing plants where the soybeans would be made into soybean meal and soybean oil that would eventually be shipped out of state was determined to be intrastate because the hauler did not have a "persistent intent" to ship the soybeans beyond the processing plant.   *Id.* at 814-16.   Based on the foregoing, the court concludes that endorsement MCS-90 plays no role in the instant

---

[4]Although the record shows that T.I. Wood used J&J Trucking dump trucks on eight other occasions in 2003, the record does not describe the nature of those trips.

16

accident because it involved only intrastate commerce from Cartersville, Georgia to Acworth, Georgia with no intention of the dirt ever going beyond Acworth.[5]

In the alternative, Plaintiff's failure to secure a judgment against T.I. Wood at the state level would also preclude this court's application of federal law to Plaintiff's claim. As the court in *White* noted, while a judgment against the insured motor carrier is not required under Georgia law, "by the terms of 49 U.S.C. § [10927(a)(2)], in order for [the insurance company] to be liable under the policy filed by [the insured] with the ICC, [the insured] must first be adjudicated liable as a party." 599 F.2d at 55.

### D.      Extent of Coverage

Plaintiff contends in its brief that the Form F endorsement and the limiting language of Progressive's policy do not actually limit the amount of coverage, but rather operate to extend the coverage to Plaintiff's claims – in both individual and administrator capacities – against Yarbrough, Burnham, and Cleckner, allowing for a fivefold recovery. *See* Plaintiff's

---

[5]Plaintiff argues that the state court already determined that the dump trucks were engaged in interstate commerce and that Progressive is bound by that finding. Although Plaintiff did not attach the state court order discussing the interstate commerce issue, it appears from Plaintiff's excerpts that the state court's discussion involved safety regulations that might apply to the dump trucks. The court notes, however, that the concept of "interstate commerce" arises in a variety of statutory contexts, *see McLeod v. Threlkeld*, 319 U.S. 491, 495 (1943) ("There is no single concept of interstate commerce which can be applied to every federal statute regulating commerce"), thus, the state court's apparent conclusion that the dump trucks owned by J&J Trucking were within the scope of certain federal safety regulations, does not impact this court's analysis as to whether the MCS-90 endorsement applies to the dump trucks hauling dirt from Cartersville, Georgia to Acworth, Georgia.

Brief, at 37-41.    Plaintiff's reasoning strains credulity.    Plaintiff argues that the limiting language is circular because if it applies, coverage would arise out of the policy itself.  As the court found, however, the policy itself does not cover the two dump trucks at issue here, and the source of coverage is the Form F endorsement.  Furthermore, even if coverage were to spring from the policy, the court finds that there is no ambiguity in the limiting language of Progressive's policy, but rather it is straightforward.   Regardless of what vehicles or claims are made, Progressive will pay no more than the limits of the policy, or $1,000,000.  However, if Progressive is required to pay a claim as a result of any filing required by law – that is the MCS-90 endorsement or the state filings – then Progressive will only pay the amount minimally required by the applicable law.   There is nothing ambiguous about the phrase "minimum coverage required by law."   The regulations of the Georgia Public Service Commission explicitly set forth a $100,000 per person and $300,000 per incident minimum.  Similarly, the regulations of the Department of Transportation set forth a $750,000 minimum.  The language of the policy comports with the intent of the federal and state legislators to provide a minimum level of coverage to the public in the event that an uninsured vehicle leased by an insured injures a member of the public.

In sum, a legislative choice was made to extend the liability coverage of the insurance company through the Form E and MCS-90 filings in order to protect the innocent public from "fly-by-night" leasing operations.   The legislature, however, required only a minimal amount of coverage for these situations.   It would defy logic to find that coverage provided only

18

because of the federal and state requirements could be over and above that which the insurance company and the insured contracted for in the underlying policy. *See also Ross*, 269 Ga. at 269 ("The State's public policy is achieved by the assurance to the motoring public of existence of the financial compensation the PSC has deemed minimally necessary for a motor common carrier to receive a certificate of public convenience and necessity, and the insurer has provided no more than the liability coverage it agreed to provide the motor common carrier.").

In light of the foregoing discussion, therefore, the court finds that the only source of coverage for Plaintiff is through Form F endorsement of Progressive's policy. Under that endorsement, recovery is limited to the state mandated minimum requirement of $100,000 per injury and $300,000 per incident.[6]

### E.   Stacking

Plaintiff next argues that both the 2001 and 2003 years of Progressive's policy are currently in effect, thereby doubling the recovery, because Progressive never filed a Form K with the State of Georgia cancelling its 2001 policy. Rule 7-2.6(b) of the Georgia Public Service Commission provides: "Certificates of insurance evidencing coverage shall be continuous and shall not be canceled or withdrawn until after thirty (30) days' notice in writing

---

[6]Plaintiff argues that under the state minimum requirements, he is entitled to $200,000 because two dump trucks were involved in the accident. The Georgia Public Service Commission Rule, however, does not make any reference to "per vehicle" calculations. Rather, it states a $100,000 minimum limit for "bodily injury to or death of one person."

19

by the insurance company . . . has first been given to the Commission at its offices in Atlanta, Georgia." *Id.*

In *Ramirez v. Progressive Preferred Insurance Company*, 321 F.3d 1055 (11th Cir. 2003), the Eleventh Circuit addressed the effect of a failure of an insurance company to file a Form K cancellation with the state.  The court concluded that based on Georgia law, once a Form E certificate of insurance is filed with the Public Service Commission, the certificate is "continuous" and is not cancelled until thirty days after the insurance company provides written notification to the Public Service Commission.  *Id.* at 1058 (citing Georgia Public Service Commission Rule 7-2.6(b)); *see also DeHart v. Liberty Mutual Insurance Company*, 270 Ga. 381 (1998).  Based on this certification, the court held that Progressive was liable for at least $100,000 under the state regulations.  The Eleventh Circuit then went on to consider whether the lack of cancellation extended the life of the underlying insurance policy itself.  The court noted that Georgia had previously established that the failure to file the Form K did not extend the underlying policy with respect to the insurer and the insured. *Id.* at 1058-59 n.3.  However, this did not address whether members of the public would still be protected by the uncancelled certificate.

Finding that the issue was unclear in state law, the Court of Appeals certified the question to the Supreme Court of Georgia which answered in *Progressive Preferred Insurance Company v. Ramirez*, 277 Ga. 392 (2003).  The Court held that the language of Form E establishes that "it is the policy of insurance, not the certificate, which establishes the

20

extent of the insurer's liability." *Id.* at 394.  Thus, "policies of insurance evidenced by a Form E certificate filed with the PSC remain in effect until cancelled as prescribed by the rule." *Id.*

As Defendant notes, however, the question in *DeHart* and *Ramirez* was whether any policy coverage would exist at all.  Here, Progressive renewed T.I. Wood's policy annually in 2002 and 2003.  There was no need to put the public on notice through a Form K cancellation that T.I. Wood was not covered by a certificate of insurance because Progressive had renewed T.I. Wood's policy.  As such, the court finds that the "continuous coverage" or "stacking" issues present in *DeHart* and *Ramirez* are not applicable here.  The court has found no case law and the parties have directed the court to none which covers the situation here where the same insurance company provided continuous coverage to the insured through renewal policies but failed to file a Form K on one of the previous policies.  The purpose of the Form K is to provide notice to the public – through the Public Service Commission – that an insurer would no longer be providing coverage for a given insured.  Thus, as *DeHart* and *Ramirez* held, when an insurer fails to make the proper notice, it is required to provide coverage to the public even if the policy between the insured and the insurer has expired.  But, here, there already is coverage provided by the 2003 Progressive policy, and, thus, there is concern about a gap in coverage to the public.  Therefore, the court finds that coverage for the incident in question is found only in the 2003 Progressive policy.  Based on the foregoing,

21

Plaintiff is entitled to $100,000 of coverage under the state filings for Progressive's 2003 policy issued to T.I. Wood.

**III.    Conclusion**

The court GRANTS IN PART AND DENIES IN PART Plaintiff's motion for summary judgment [35-1], GRANTS Plaintiff's motion for leave to file excess pages [36-1], GRANTS Defendant's motion for leave to file excess pages [37-1], GRANTS IN PART AND DENIES IN PART Defendant's motion for summary judgment [38-1], and GRANTS Plaintiff's motion for leave to file excess pages [41-1].

**IT IS SO ORDERED** this 17th day of March 2006.

                          s/ J. Owen Forrester
                          J. OWEN FORRESTER
                          SENIOR UNITED STATES DISTRICT JUDGE

22